# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

DIANA DILLON,                                )
                                             )
    Plaintiff,                     )
                                             )
    v.                             )        CAUSE NO. 1:06-CV-00112
                                             )
JO ANNE B. BARNHART,                         )
Commissioner of Social Security,             )
                                             )
    Defendant.                     )

## OPINION AND ORDER

Plaintiff Diana Dillon appeals to the district court from a final decision[1] of the Commissioner of Social Security ("Commissioner") denying Dillon's application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB"). For the reasons set forth herein, the Commissioner's decision will be AFFIRMED.[2]

## STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing." 42 U.S.C. § 405(g). The ALJ's decision must be sustained if it is supported by substantial evidence. *Clifford v. Apfel*, 227

---

[1]Dillon filed her application for DIB on October 21, 2003, alleging disability since September 13, 2002. After the Commissioner denied the application, Dillon requested a hearing, which was held on October 14, 2004, before Administrative Law Judge ("ALJ") Richard VerWiebe.  In April 2005, the ALJ concluded that Dillon was not disabled pursuant to 20 C.F.R. § 404.1520. Dillon requested Appeals Council review, which was denied, making the ALJ's decision the final decision of the Commissioner. Dillon now seeks judicial review pursuant to 42 U.S.C. §405(g).

[2] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. §  636(c).

F.3d 863, 869 (7th Cir. 2000).

Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Id.*

Under this standard, the Court reviews the entire administrative record, but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Id.*

## DISCUSSION

To be considered disabled under the Act, a claimant must establish that she is "[unable] to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1); 42 U.S.C. § 423(d)(1)(A). The impairment must be severe, causing the claimant to be unable to do her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 405.1505-1511.

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the

claimant is incapable of performing work in the national economy.[3] 20 C.F.R. § 404.1520; *see also*

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the

next step or, on steps three and five, to a finding that the claimant is disabled. *Zalewski v. Heckler*,

760 F.2d 160, 162 n.2 (7th Cir. 1985). A negative answer at any point other than step three stops the

inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the

claimant on every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at

868.

After following the five sequential steps laid out above and reviewing the medical evidence,

the ALJ in this case found that: (1) Dillon had not performed substantial work since her alleged

onset date; (2) her physical impairments were severe;[4] (3) her physical complaints did not meet or

equal a listed impairment; (4) she could not perform her past relevant work; and (5) under the

Medical-Vocational Guidelines, she  is capable of performing the full range of sedentary work

within the economic region. Of significance in this appeal, Dillon contends that the ALJ erred in his

conclusion that she was not disabled by rejecting her testimony because, in the ALJ's opinion, there

were no objective medical findings to support her testimony. (Tr. 17.) After a review of the record,

the Court shall proceed to a discussion of Dillon's argument.

### Relevant Factual Background and Medical Evidence

Dillon was 44 years old at the time of the hearing with a high school education and past work

---

[3] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC"), or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

[4] Specifically, the ALJ concluded that Dillon's impairments of right hand neuropathy and status post multiple fractured vertebral bodies were severe.

experience as a factory worker. (Tr. 14.) She alleges disability due to right hand cramping and body aches from post multiple fractured vertebral bodies.

On October 24, 2003, Dillon saw Dr. Gerald Warrener complaining of chronic back pain and diminished use of her right arm. (Tr. 88.) She reported that in 1989, she had been involved in a serious boating accident and suffered a cervical vertebra fracture. (*Id*.) Later that same year, she was in an automobile accident that caused a neck injury. (*Id*.) Since these incidents, Dillon reported experiencing spasms when using her right hand. (*Id*.) She also experienced pain in her right leg. (*Id*.) Upon physical examination, she had some vertebral tenderness over the lower cervical spine, but her range of motion of the neck was satisfactory. (*Id*.) Her upper extremity strength appeared to be normal, and her reflexes were normal. (*Id*.) Dr. Warrener's tentative diagnosis was probable degenerative disc disease and posttraumatic arthritis of the spine. (*Id*.) He referred Dillon to a neurologist for further evaluation. (*Id*.)

On November 6, 2003, Dillon saw Dr. M. Naeem for an evaluation of her chronic low back and neck pain. (Tr. 83-85.) Dillon reported that since a motor vehicle accident she had been experiencing chronic daily back and neck pain which had become progressively worse. (*Id*.) She described the pain as sharp and as a burning sensation over the back of her neck as well as the upper thoracic region. (*Id*.) She also complained of localized low back pain with an occasional burning sensation over her right thigh as well as the leg region. (*Id*.) She denied any radicular symptoms in her lower extremities. (*Id*.) She also reported having right hand spasms if she uses her hand for a long time. (Id.) She denied any radiating pain to her right upper extremity. (Id.) She indicated that

she had taken Celebrex[5] without any significant improvement in her symptoms. (*Id*.)

On physical exam she followed complex commands easily. (Tr. 84.) On motor examination there was no weakness or atrophy. (*Id*.) Sensory examination was normal. (Tr. 85.) Her deep tendon reflexes were normal. (*Id*.) Her gait was normal. (*Id*.) Dr. Naeem found that the physical exam was remarkable for muscular tenderness as well as limitation of her neck extension and flexion on the left side. (*Id*.) In his opinion her symptoms were most likely related to muscle spasms which were possibly due to degenerative joint disease. (*Id*.) He recommended further testing including x-rays. (*Id*.) He prescribed Bextra[6] and she was to follow up with him in 6 weeks. (*Id*.)

An x-ray of her thoracic spine showed moderate loss of height of T7, mild loss of height of T11, and moderate loss of height of L1 vertebral bodies; the age of these compression injuries was uncertain. (Tr. 79.) There were also minor degenerative changes in the thoracic spine. (*Id*.) A cervical spine x-ray done on November 12, 2003, showed reversal of normal cervical lordosis, deformity of C5 that did not appear acute, and mild narrowing of the C5-C6 interspaces. (Tr. 78.)

On December 4, 2003, Dillon saw Dr. Naeem for a recheck. (Tr. 76.) She informed him that she had pulled a muscle at the back and side of her neck but did not know how she had done it. (*Id*.) She reported that the Bextra helped some but not significantly. (*Id*.) She also had anxiety and some headaches. (*Id*.) His diagnosis was chronic back pain, and he increased her Bextra. (Tr. 77.)

On January 9, 2004, Dr. A. Dobson, a State Agency doctor, completed a Residual Functional Assessment form in which he found that Dillon was capable of performing medium work with only

---

[5] Celebrex is indicated for the relief of signs and symptoms of osteoarthritis, rheumatoid arthritis, ankylosing spondylitis, and the management of acute pain. Physicians' Desk Reference (hereinafter "PDR") 3131 (60th ed. 2006).

[6] Bextra is for the relief of signs and symptoms of osteoarthritis, rheumatoid arthritis, and primary dysmenorrhea. PDR at 2696 (59th ed. 2005).

the occasional ability to climb ladders, ropes, and scaffolds. (Tr. 89-96.) His assessment was affirmed by another State Agency physician on February 12, 2004. (*Id*.)

On February 24, 2004, Dillon saw Dr. Naeem, complaining of hand cramping and locking fingers even when not using her hands. (Tr. 112.) She reported that the Bextra did not help and that she was taking Flexeril.[7] (*Id*.) She also reported achiness in her right leg and a feeling of heaviness or tightness in her leg when she is cold or in the rain. (*Id*.) She was seen again on March 8, 2004, and again on May 4, 2004. (Tr. 102-03.)

On March 17, 2004, she complained of a burning sensation with "needles" from her neck down to her tailbone. (Tr. 110.) She also complained of numbness and tingling in the right arm from the elbow to the hand. (*Id*.) She reported that Bextra was helpful with the back pain. (*Id*.) The doctor diagnosed chronic back pain and right upper extremity pain. (Tr. 111.) She was seen again on July 21, 2004. (Tr. 108-09.)

On March 8, 2004, Dr. B. A. Lockwitz wrote Dr. Naeem. (Tr. 131.) He noted that Dillon complained for a year of cramping of her right hand involving the second, third, and fourth digits. (*Id*.) He found that this was not true triggering of the digits to suggest tenosynovitis but more of a cramp. (*Id*.) He noted that it occurs when she is doing activities and that she had difficulty holding down a job because of the problem. (*Id*.) She told him that she was not able to let go of beverage glasses when she was working in a bar. (*Id*.) On physical exam she did not show any objective synovitis or joint deformities, and there was no evidence of tenosynovitis or triggering involving the right hand. (*Id*.) Her strength was intact, and he found no objective abnormalities to suggest peripheral vascular disease or Raynaud's phenomenon. (*Id*.) He found no muscular atrophy. (*Id*.)

---

[7]Flexeril is indicated as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute, painful musculoskeletal conditions. PDR at 1833.

He concluded that he found no better explanation for her particular complaint of right hand spasm. (*Id*.) He did agree that Dillon was suffering from chronic back pain as a consequence of multiple vertebral fractures from a past motor vehicle accident with continuing spasms or contractures of her hands of uncertain etiology. (*Id*.) He did not see any suggestion of inflammatory joint disease, and the labs had already been done. (*Id*.) He found that she would have difficulty maintaining employment due to her difficulties with relatively simple tasks included activities of daily living. (*Id*.)

On May 4, 2004, a DEXA bone density test was performed which showed she had osteopenia[8] of the hip and spine. (Tr. 123-27.)

On May 26, 2004, Dillon underwent a lumbar spine MRI which showed a 50% loss of height of the L1 vertebral body with normal marrow signal. (Tr. 122.) This suggested an old compression injury and moderate degenerative changes of the facets bilaterally at the L5-S1 level. (*Id*.) An MRI of the thoracic spine on the same date showed a 50% loss of height of the T7 vertebral body with normal marrow signal suggesting an old compression injury and scattered Schmorl's nodes[9] in the thoracic region. (Tr. 121.) A cervical spine MRI on the same date showed a deformity of the C5 vertebral body with normal marrow signal suggesting an old injury. (Tr. 120.) A nerve conduction-EMG study of June 23, 2004, showed right median axonal motor neuropathy,[10] mild right sural

---

[8]Osteopenia is a condition marked by deficiency of bone; the presence of less than the normal amount of bone. J.E. Schmidt M.D., Schmidt's Attorneys' Dictionary of Medicine (hereinafter "Schmidt's"), Volume 3 O-90 (1994).

[9]Schmorl's nodes are a nodule (small lump) seen in x-ray pictures of the spine, caused by the protrusion of the soft contents of a ruptured intervertebral disk. Schmidt's, Volume 4 at S-43.

[10]Neuropathy is a nervous disease, especially a degenerative rather than an inflammatory disease of a cranial or spinal nerve. The condition may be due to poor blood supply, trauma, lead poisoning, diabetes, etc. Schmidt's, Volume 3 at N.

sensory nerve neuropathy, and right C8 to T1 and L4 to S1 subacute radiculopathy.[11] (Tr. 114-17.)

On November 3, 2004, Dr. Lockwitz provided another letter to the ALJ at his request. (Tr. 133.) He noted his previous evaluation and the previous testing. (*Id.*) He did not believe that Dillon would have a problem with her ability to walk, stand, or sit. (*Id.*) But he found that carrying and lifting would be impaired by the spasm that she has, and because she states that it is aggravated by activity. (*Id.*) He noted the fact that she has symptoms that cannot always be explained by objective findings. (*Id.*)

On December 14, 2004, Dr. Naeem provided a letter to Dillon's attorney. (Tr. 136.) He noted her referral to a pain specialist. (*Id.*) He noted that he did not see any significant weakness on examination, but she had some sensory symptoms as well as intermittent muscle spasms that are probably related to her motor vehicle accident and probably would limit her ability to do activities of daily living and physical activity. (*Id.*) He also noted that he scheduled her to see Dr. Kazi in the next few weeks, and he hoped that she would receive some significant help from him. (*Id.*)

Based upon this evidentiary record, the ALJ reached the conclusion that Dillon was not disabled because she could perform a full range of sedentary work thereby disqualifying her from DIB. The Court turns now to an examination of Dillon's argument that the ALJ erred in his analysis and conclusion.

## Credibility

Dillon contends that her case should be remanded for reconsideration because the ALJ insufficiently explained why he discredited her testimony regarding her limitations. Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to

---

[11]Radiculopathy is any disease of the roots of spinal nerves. Schmidt's, Volume 4 at R-8.

special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is

grounded in the record and articulates his analysis of the evidence "at least at a minimum level," *Ray*

*v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838

(N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result,"

*Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000), his determination will be upheld unless it is

"patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th

Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on

"serious errors in reasoning rather than merely the demeanor of the witness").

      In his opinion, the ALJ began by chronologically summarizing the medical evidence

presented at the hearing. (Tr. 16-17.) In addition, he summarized Dillon's testimony regarding her

physical limitations as follows:

> At the hearing the claimant testified that she is right handed and that she last worked as an inspector for six months. She testified that she has severe cramping in her right hand. The cramping occurs with or without activity. The cramping lasts 40-50 minutes and occurs several times per day. She is frequently dropping things and having difficulty gripping and grasping. She also stated that she has nerve damage and pain in her body, due to injuries from a motor vehicle accident years ago. She also testified that she has problems with focusing. She stated that she frequently requires the use of the bathroom and that she is clumsy.
>
>     With regards to her daily activities the claimant reported that she is able to perform personal care such as showering and getting dressed, but at a slower pace. She is able to perform household chores such as making a bed, cooking, dusting, doing the laundry, grocery shopping, and lawn work, but at a slower pace.

(Tr. 17.)

      After reviewing the medical evidence and comparing it to the testimony of Dillon, the ALJ

concluded that Dillon's testimony was not "wholly credible," (*id.*), explaining that "although the

medical evidence supports that the claimant has a severe impairment, it does not support the

claimant's testimony regarding the severity of symptoms." (*Id.*) The ALJ went on to explain that

"there are no objective findings to support that the claimant would have difficulty grasping and gripping objects because the medical findings show mild neuropathy of the right upper extremity" and "[t]here is no motor weakness or neurological findings that would support the severity of symptoms that the claimant testified to." (*Id.*) The ALJ then considered the medical evidence provided by the treating physician and concluded that the treating physician "reported that the objective findings did not tie into the claimant's symptoms with the right hand." (*Id.*) While the ALJ acknowledged that the treating physician indicated that Dillon may have difficulty carrying/lifting, due to the spasm in her right hand, he further noted that the evidence from the treating physician did not show that "she would have any problem with her ability to walk, stand, or sit" and "no treating or examining physician had indicated that the claimant cannot do at least sedentary work." (*Id.*)

Dillon asserts that the above conclusion from the ALJ failed to take into account the physical limitations she experienced related to her daily living activities, her need to take breaks and perform activities slower, and her frequent need to go to the bathroom.  However, the record built by the ALJ is not silent on these points but rather affirmatively mentioned Dillon's testimony about her daily living activities and considered these facts in combination with the objective medical evidence and physician findings. *See* 20 C.F.R.§ 404.1529(c)(2) (objective medical evidence is a "useful indicator" in evaluating intensity and persistence of symptoms and their effect on a person's ability to do work). As noted above, the ALJ considered Dillon's testimony as to her limitations, the diagnostic results of x-rays, MRI's, etc., along with the clinical physician findings of record. These findings demonstrated to the ALJ that during the relevant period, Dillon maintained normal strength, sensation and reflexes, (Tr. 83-85, 88, 131), and there were no signs of atrophy or synovitis in her upper or lower extremities. (Tr. 131.)

Given the above analysis of the evidence, the ALJ adequately built a bridge between the evidence and his credibility determination. The ALJ presented a "thorough and complete picture of the evidence," *see Zalewski*, 760 F.2d at 166-67, which showed that during the relevant period Dillon was evaluated and treated for her physical complaints by numerous physicians, who, based on their objective medical testing (including laboratory work, x-rays, MRIs, and EMGs), diagnosed her with various spinal conditions and right hand neuropathy. None of these physicians, however, assigned her any physical limitations although they did suggest that her conditions may affect her activities of daily living and that carrying and lifting may aggravate the spasms in her right hand. (Tr. 133, 136); *see Smith v. Apfel*, 231 F.3d 433, 439 (7th Cir. 2000) ("[A]n ALJ may consider the lack of medical evidence as probative of the claimant's credibility"); SSR 96-7p. Moreover, as the ALJ noted, none of the physicians indicated that Dillon could not perform sedentary work.[12]

In light of the foregoing, the ALJ has at least at a minimal level built an accurate and logical bridge between the evidence and his conclusion. *See generally Edwards v. Sullivan*, 985 F.2d 334, 338 (7th Cir. 1993) ("[I]t is generally understood that a reviewing court does not reconsider credibility determinations made by the ALJ so long as they find some support in the record."). Accordingly, his credibility determination, which is entitled to special deference, will not be overturned on this basis.

---

[12]Although not mentioned by the ALJ, two State Agency physicians examining Dillon indicated that she could perform medium work with only the occasional ability to climb ladders, ropes and scaffolds. This further bolsters the ALJ's analysis in that it is clear that he considered Dillon's testimony regarding her limitations when he concluded that she could perform sedentary work, and apparently, rejected the opinions of the two State Agency physicians.

## **CONCLUSION**

For the reasons set forth above, the Court finds that the decision of the ALJ is AFFIRMED.

Enter for this 19th day of March, 2007.

s/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge